UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \* \* \*

| | |
|---|---|
| HATTIE BROWN, individually and as the co-guardian of Plaintiff EUGENE BROWN, an incapacitated adult; TROY BROWN, as co-guardian,<br><br>Plaintiffs,<br><br>vs.<br><br>MT. GRANT GENERAL HOSPITAL; JUANCHICHOS T. VENTURA, M.D.; DANIEL A. WILLIAMS, JR., M.D.,<br><br>Defendants. | 3:12-CV-00461-LRH-WGC<br><br>ORDER |

Before the court are Defendants Mineral County Hospital District (d.b.a. Mt. Grant General Hospital), Juanchicos T. Ventura, M.D., and Daniel A. Williams, Jr., M.D.'s ("Defendants") Motion to Dismiss (#40[1]) and Motion to Dismiss State Law Claims (#41). Plaintiffs Hattie Brown, Eugene Brown, and Troy Brown ("Plaintiffs") have responded (##45, 47, respectively), and Defendants have replied (##52, 53, respectively). Also before the court are Defendants' Motion to Dismiss Claims (#57), to which Plaintiffs have responded (#58) and Defendants have replied (#61), and Plaintiffs' Motion to Substitute (#60), to which Defendants have responded (#62) and Plaintiffs have replied (#67).

I.  **Facts and Procedural History**

This action stems from the alleged mistreatment of Eugene Brown, an elderly black man, while he was in the care of Mt. Grant General Hospital ("Mt. Grant") and physicians Ventura and

---

[1] Refers to the court's docket entry number.

1  Williams. Eugene was[2] an incapacitated adult under the guardianship of his wife Hattie and his
2  son Troy. Second Amended Complaint ("SAC") #39, ¶¶ 1-3. On March 8, 2011, Eugene was
3  admitted to Mt. Grant for treatment of various medical problems, including pneumonia. *Id*. at
4  ¶ 13. Eugene was hospitalized for this treatment until May 19. *Id*. at ¶ 15.

During this period, while heavily medicated and under the care of Ventura and Williams, Eugene developed decubitus ulcers—also known as bedsores—which Defendants intentionally concealed. *Id*. at ¶¶ 16–18. As the bedsores worsened, and Eugene's skin continued deteriorating, the injuries resulted in exposed muscle and bone around his legs, buttocks, and genitals. *Id.* at ¶ 18. These exposed areas also led to multiple infections, requiring surgery and other medical procedures to treat. *Id.*

Sometime around April 9, Ventura or Williams contacted another facility for a "wound care consultation," and this facility recommended that Eugene be transferred for immediate surgical attention. *Id*. at ¶ 19. However, Defendants continued to treat the bedsores themselves, and the transfer did not occur until May 19. *Id.* at ¶ 22–23. This resulted in more severe bedsores and more serious infections. *Id*. at ¶ 23. Though Defendants claimed they did not have the ability to transfer Eugene before May 19, they allegedly transferred young, female, white patients in the interim. *Id.* at ¶ 20.

Defendants removed this action from Nevada state court on August 28, 2012 (#1). The court granted Defendants' Motion to Dismiss on January 9, 2013 (#38). Plaintiffs then filed their Second Amended Complaint on January 22, 2013 (#39), bringing two claims under 42 U.S.C. § 1983 against Defendants for violations of Eugene's substantive due process and equal protection rights under the Fourteenth Amendment. The due process claim alleges that Defendants had a duty to protect Eugene from a danger they created. The equal protection claim alleges Defendants discriminated against Eugene on the basis of sex or race. Plaintiffs also allege state law claims for negligence and elder abuse. Defendants now move to dismiss all claims.

///

---

[2] Eugene died on February 15, 2013.

## II. Legal Standard

To survive a motion to dismiss for failure to state a claim, a complaint must satisfy the Federal Rule of Civil Procedure 8(a)(2) notice pleading standard. *See Mendiondo v. Centinela Hospital Medical Center*, 521 F.3d 1097, 1103 (9th Cir. 2008). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Rule 8(a)(2) pleading standard does not require detailed factual allegations; however, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Furthermore, Rule 8(a)(2) requires a complaint to "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference, based on the court's judicial experience and common sense, that the defendant is liable for the misconduct alleged. *See id.* at 678-79. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 678 (internal quotation marks and citation omitted).

In reviewing a motion to dismiss, the court accepts the facts alleged in the complaint as true. *Id.* (citation omitted). However, "bare assertions . . . amount[ing] to nothing more than a formulaic recitation of the elements of a . . . claim . . . are not entitled to an assumption of truth." *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 680) (alteration in original) (internal quotation marks omitted). The court discounts these allegations because they do "nothing more than state a legal conclusion – even if that conclusion is cast in the form of a factual allegation." *Id.* "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

1  **III.    Discussion**

2      **A.    Due Process Claims**

3      Plaintiffs claim Defendants failed to protect Eugene's substantive due process right to
4  "bodily integrity," as guaranteed by the Fourteenth Amendment. *See Albright v. Oliver*, 510 U.S.
5  266, 372 (1994). However, "the state's failure to protect that [right] does not violate the
6  Fourteenth Amendment, unless one of two exceptions applies: (1) the special relationship
7  exception, or (2) the state-created danger exception." *Campbell v. State of Washington Dep't of*
8  *Soc. & Health Serv.*, 671 F.3d 837, 842 (9th Cir. 2011) (citing *DeShaney v. Winnebago County*
9  *Dep't of Soc. Serv.,* 489 U.S. 189 (1989)). Plaintiffs here rely exclusively on the "state-created
10  danger" exception.

11      To satisfy the "state-created danger" exception, a plaintiff must show the defendant
12  "create[d] or expose[d] an individual to a danger which he or she would not have otherwise
13  faced." *Id.* at 845. This requires the defendant to have affirmatively acted to place the plaintiff in
14  danger. *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (2006). Furthermore, the defendant
15  must have acted with "deliberate indifference to a known or obvious danger." *Id.* (quoting *Patel*
16  *v. Kent Sch. Dist.*, 648 F.3d 965, 971–72 (9th Cir. 2011)). A state actor is deliberately indifferent
17  if that actor "recognizes [an] unreasonable risk and actually intends to expose the plaintiff to such
18  risks without regard to the consequences to the plaintiff." *Patel*, 648 F.3d at 974 (quoting *L.W. v.*
19  *Grubbs*, 92 F.3d 894, 899 (9th Cir. 1996)).

20      Here, Plaintiffs have failed to properly allege the "state-created danger" exception—or
21  any § 1983 claim—against defendant Mt. Grant. Because Mt. Grant is a county-owned hospital,
22  it can be held liable under § 1983 only if Plaintiffs show that "action pursuant to official
23  municipal policy of some nature caused a constitutional tort." *Brass v. County of Los Angeles*,
24  328 F.3d 1192, 1198 (9th Cir. 2003) (quoting *Monell v. Dep't of Soc. Serv. of City of New York*,
25  436 U.S.658, 691 (1978)) (internal quotation marks omitted). But Plaintiffs have not alleged that
26  any of Defendants' actions followed a Mt. Grant policy or custom. Indeed, Plaintiffs expressly
27  indicate that Defendants' actions were contrary to any established policy. Thus, Plaintiffs § 1983
28  claims against Mt. Grant fail.

In contrast, Plaintiffs have sufficiently pleaded the state-created danger exception against Ventura and Williams. First, Plaintiffs' complaint gives rise to the inference that, but for these defendants' over-medication of Eugene, Eugene would have avoided severe bedsores (or avoided bedsores altogether). Absent his medicated torpor, Plaintiffs suggest, Eugene would have moved enough to avoid bedsores or communicated his pain to his family. Thus, Plaintiffs have alleged an affirmative act that created or increased Eugene's risk of harm. Second, Plaintiffs have alleged that Defendants deliberately concealed Eugene's bedsores through his continued over-medication and through Defendants' refusal to transfer him for surgical debridement. These allegations sufficiently imply that Defendants knew of the risk of serious or substantial harm to Eugene and failed to respond to that risk. That is, Plaintiffs have alleged Defendants' deliberate indifference. Accordingly, Plaintiffs have made out a claim under § 1983's state-created danger exception.

Defendants respond that Plaintiffs' claim fails because their allegations either do not imply Defendants' deliberate indifference or they do not state the claim with sufficient specificity. The court disagrees. First, Defendants mistakenly argue that only a complete lack of medical care gives rise to an inference of deliberate indifference. On the contrary, inadequate treatment (rather than a complete lack of it) may constitute deliberate indifference. *See Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989). Defendants also argue that their decision to reject the advice of the "wound care consultant" amounts to a difference of medical opinion insufficient to rise to deliberate indifference. Yet doctors may be deliberately indifferent if "'the course of treatment the doctors chose was medically unacceptable under the circumstances' and [] the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). Here, Plaintiffs have met this standard by alleging that the doctors rejected outside advice out of a desire to conceal their mistreatment of Eugene. Second, Defendants contend that the complaint does not precisely allege which doctor performed which acts, thereby failing to state a claim under Rule 12(b)(6). However, the complaint clearly states that both doctors participated in Eugene's mistreatment, and in order to survive a motion to dismiss under Rule 12(b)(6), that is enough. *Iqbal*, 556 U.S. at 678-79 (holding that a claim is

1   facially plausible if the factual content is sufficient to allow the court to reasonably infer, based
2   on the court's judicial experience and common sense, the defendant's liability in the alleged
3   misconduct).

4   Ventura and Williams assert the defense of qualified immunity, but this defense fails.
5   Qualified immunity is appropriate if the facts, taken in the light most favorable to the plaintiff,
6   show the defendant official's conduct did not violate the plaintiff's clearly established
7   constitutional right. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from on other*
8   *grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). The court has already determined that
9   Ventura and Williams' alleged conduct violated Eugene's constitutional right to bodily integrity.
10  The remaining question is whether this right was clearly established at the time.

11  It was. A right is clearly established for the purposes of qualified immunity when a
12  reasonable official would have known that the alleged conduct was unlawful. *Id*. at 202. "[I]n
13  order to find that the law was clearly established . . . [the court] need not find a prior case with
14  identical, or even 'materially similar' facts." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1065
15  (9th Cir. 2006) (quotation marks and citation omitted). Rather, the court determines if
16  "preexisting law provided the defendants with 'fair warning' that their conduct was unlawful" *Id*.
17  In *Penilla v. City of Huntington Park*, 115 F.3d 707 (9th Cir. 1997), the court addressed
18  materially similar facts. Juan Penilla was on his porch when he became seriously ill. His
19  neighbors called 911 for emergency medical services, and two police officers arrived first.
20  Though finding Penilla to be seriously ill, they cancelled the request for paramedics and moved
21  Penilla inside his house, locking him in. The next day, Penilla's family members discovered him
22  on the floor, dead from respiratory failure. The court held this conduct to satisfy the state-created
23  danger exception, denying the officers qualified immunity. *Penilla*, 115 F.3d at 711.

24  Here, as in *Penilla*, the officials took affirmative acts that significantly increased the risk
25  facing the plaintiff: they over-medicated Eugene, took efforts to conceal the resulting harm, and
26  refused to transfer him for emergency treatment. As the *Penilla* court concluded, the Ninth
27  Circuit has clearly established that "if affirmative conduct on the part of a state actor places a
28  plaintiff in danger, and the [official] acts in deliberate indifference to that plaintiff's safety, a

claim arises under § 1983." *Id.* at 710. Defendants' qualified immunity defense therefore fails.

### B.     Equal Protection Claims

Defendants next argue Plaintiffs' equal protection claim is merely conclusory and therefore insufficient. A violation of the Fourteenth Amendment's Equal Protection Clause must include an intent to discriminate. *Washington v. Davis*, 426 U.S. 229, 239–240 (1976). Although "an invidious discriminatory purpose may often be inferred from the totality of the relevant facts," a disproportionate impact alone is not sufficient to constitute an equal protection violation. *Id.* at 242. Furthermore, satisfying the requisite "discriminatory purpose" requires showing the decisionmaker acted "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).

In their argument, Defendants rely extensively on facts additional to those stated in Plaintiffs' SAC. In support of these facts, Defendants refer to medical records and other declarations. When ruling on a 12(b)(6) motion, however, courts generally cannot consider materials outside the pleadings. *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). But Defendants argue the court can properly consider these documents in a 12(b)(6) motion to dismiss because Plaintiffs allege their contents in their complaint, *see In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996), and because these documents are part of public record. *See Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986) (*abrogated on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991)).

Defendants' first argument fails because Plaintiffs do not allege any medical records' or declarations' contents. Though Plaintiffs allege some of the same actions also described in these documents, that is not the same as directly alleging the documents' contents. Were the court to interpret this rule as expansively as Defendants suggest, courts would be able to consider a vast amount of documents inappropriate at the 12(b)(6) stage. Further, Plaintiffs' claims do not necessarily depend on the contents of these documents. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). Thus, Plaintiffs' allegations do not support use of the "incorporation by

reference" doctrine.

Defendants' second argument for considering these documents also fails. Though a court may properly look to "matters of public record" when deciding a 12(b)(6) motion, the Ninth Circuit in *Mack* was mainly considering "records and reports of administrative bodies." 798 F.2d at 1282. In this case, the documents Defendants cite are public only because Defendants themselves made them public by entering them into the court records as part of a prior motion to dismiss. *See* Defs.' Reply, #37-2. Further, in support of its decision in *Mack*, the Ninth Circuit cited *Sears, Roebuck & Co. v. Metro. Engravers, Ltd.*, 245 F.2d 67, 70 (9th Cir. 1956), which held that while "judicial notice may be taken of a fact to show that a complaint does not state a cause of action," if it presents a question of fact that cannot be decided without evidence, it is improper to dismiss the complaint for failure to state a claim. Finally, even when these documents satisfy the criteria for a court to take judicial notice of them, Federal Rule of Civil Procedure 12(d) provides courts with discretion over whether to consider these documents. *See Keams v. Tempe Technical Inst.*, 110 F.3d 44, 46 (9th Cir. 1997). Because Defendants' documents would not have been public independent of Defendants' filings, the court finds it inappropriate to consider the documents' contents. And even if the court were to consider their contents, they would simply raise a question of fact that cannot be decided without evidence.

Based on the facts in their complaint, Plaintiffs have sufficiently pleaded an equal protection claim against Ventura and Williams.[3] Plaintiffs allege these doctors told them Mt. Grant did not have the resources to transfer Eugene, despite the fact they transferred younger, white, female patients. Given the rest of the alleged conduct surrounding Eugene and his bedsores, Plaintiffs' complaint plausibly gives rise to the inference that Ventura and Williams intentionally discriminated against Eugene on the basis of sex or race by withholding his transfer. Moreover, because "the non-discrimination principle is so clear," Ventura and Williams' qualified immunity defense fails. *Elliot-Park v. Manglona*, 592 F.3d 1003, 1008 (9th Cir. 2010).

---

[3] As noted above, Plaintiffs have failed to properly allege Mt. Grant's supervisory liability for any constitutional violations under § 1983.

### C. State Law Claims

Plaintiffs bring two state law claims against Defendants, one for elder abuse and one for negligence. Defendants object that the elder abuse claim is improperly pleaded as an end-run around Nevada's medical malpractice limitations. Defendants also argue that Plaintiffs negligence claim fails to include a proper expert affidavit in support.

#### 1. Elder Abuse

Plaintiffs allege a claim for elder abuse under Nevada Revised Statute ("NRS") § 41.1395. Defendants argue that Plaintiffs are attempting to plead around the statutory regime regulating medical malpractice. This regime contains a restriction on compensable damages, *see* NRS § 41A.035, and a shorter than normal limitations period, *see* NRS § 41A.097. In contrast, § 41.1395 provides for double damages and the default limitations period, *see* NRS § 11.190. Therefore, these statutes conflict, at least as applied to the facts here.

In order to predict how the Nevada courts would resolve this conflict, this court resorts to Nevada's rules of statutory interpretation. *Candelaria Industries v. Occidental Petroleum Corp.*, 662 F. Supp. 1002, 1004 (D. Nev. 1984). "When two statutes are clear and unambiguous but conflict with each other when applied to a specific factual situation, an ambiguity is created and we will attempt to reconcile the statutes." *Szydel v. Markman*, 117 P.3d 200, 202–03 (Nev. 2005). This reconciliation takes place with a view towards honoring the legislature's intent while avoiding absurd or inharmonious results. *Fierle v. Perez*, 219 P.3d 906, 911 (Nev. 2009), *overruled on other grounds by Egan v. Chambers*, 299 P.3d 364 (Nev. 2013).

These principles of interpretation suggest that Plaintiffs may not allege an elder abuse claim under the present circumstances. First, the elder abuse statute was not intended as a remedy for torts that sound in medical malpractice such as those alleged here. As revealed by NRS § 41.1395's legislative history, Nevada's Attorney General proposed the elder abuse statute in order to incentivize private attorney generals to enforce *criminal* prohibitions against elder abuse. The Attorney General explained, "The burden of proof required in a civil action is not as high as that in a criminal trial, so it is hoped that this will help victims to recover for their losses." *Minutes of the Nev. State Legislature: Hearing on Senate Bill No. 80 Before the Senate Comm.*

*on Judiciary*, Ex. D, 1997 Leg., 69th Sess. (Feb 12, 1997). The double-damages recovery and an additional attorney's fee provision were designed to encourage private attorneys "to prosecute [elder abuse] cases when criminal prosecutors cannot." *Id.* (statement of Deputy Attorney General Brand). Therefore, the elder abuse statute's history reveals that it was initially concerned with criminal conduct—conduct whose mens rea element usually exceeds mere negligence. This is also reflected in the statute's concentration on intentional conduct: the statute prohibits "willful and unjustified" abuse, "exploitation," and "neglect" in the face of an expressly assumed duty. *See* NRS § 41.1395. The mens rea element of a medical malpractice claim—"failure . . . to use the reasonable care, skill, or knowledge ordinarily used under similar circumstances," NRS § 41A.009—sits uneasily with § 41.1395's focus on intentional misconduct.

Second, the statute's text and legislative history primarily address the regulation of long-term care for the elderly. The statute speaks of liability in the event a person fails to "maintain the physical or mental health of an older person" or "exploit[s]" the elderly by gaining their "trust and confidence." These phrases invoke continuing and long-term relationships. For instance, the verb "maintain" means "to keep in existence or continuance; preserve; retain." *Owasso Indep. Sch. Dist. No. I–011 v. Falvo*, 534 U.S. 426, 433 (2002) (citation omitted). The prohibition on exploitation envisions the perversion of a relationship built on "trust and confidence," typically the product of lengthy association. Similarly, testimony from Nevada's Division for Aging Services recognized the types of caretakers subject to potential liability: "social workers who provide . . . services to older people and . . . agencies [that] provide in-home services, such as personal care, homemaker, respite, and companion." *Minutes of the Nev. State Legislature: Hearing on Senate Bill No. 80 Before the Assembly Comm. on Judiciary*, Ex. C, 1997 Leg., 69th Sess. (April 16, 1997). Each of these services normally takes place over extended periods of time.

Thus, both the plain language of § 41.1395 and its legislative history suggest that the statute targets the relationship between long-term caretakers and their charges. This is in contradistinction to the type of relationship that exists between hospitals and their patients. Indeed, during hearings on § 41.1395, several legislators addressed the statute's potential impact

on "nursing homes," "managed care facilities," "long-term care facilities," "group homes," caretaking family members, even homeless shelters, yet no legislator mentioned hospitals or clinics. *See Minutes of the Nev. State Legislature: Hearing on Senate Bill No. 80 Before the Assembly Comm. on Judiciary*, 1997 Leg., 69th Sess. (June 4, 1997) ("[B]y passing this in the present form it would be open season on the nursing homes.") (statement of Assemblyman Sandoval); *Minutes of the Nev. State Legislature: Hearing on Senate Bill No. 80 Before the Assembly Comm. on Judiciary*, 1997 Leg., 69th Sess. (April 15, 1997) (discussing "nursing homes and managed care facilities," "family member[s] volunteering to take on the obligation of taking care of a family member," "group home[s]," and "long-term care facilit[ies]") (statements of Assemblymen Sandoval and Carpenter and Deputy Attorney General Roberts); *Minutes of the Nev. State Legislature: Hearing on Senate Bill No. 80 Before the Senate Comm. on Judiciary*, 1997 Leg., 69th Sess. (June 18, 1997) (discussing "homeless shelters") (statement of Senator Adler). The entities discussed by the legislators share a common attribute: they are all, in one way or another, long-term care facilities. The absence of hospitals from this list is therefore unremarkable. Unlike long-term care facilities, hospitals are typically acute care facilities—places one goes to receive short-term treatment for treatable ailments. And while hospitals go unmentioned in the elder abuse statute, they are explicitly acknowledged in the medical malpractice statutes. *See* NRS § 41A.009.

Moreover, the Nevada Supreme Court has signaled a disapproval of artful pleading for the purposes of evading the medical malpractice limitations. For example, the Court concluded that medical malpractice claims extend to "both intentional and negligence-based" actions. *Fierle*, 219 P.2d at 913 n. 8. This means that a plaintiff cannot escape the malpractice statutes' damages or timeliness limitations by pleading an intentional tort—battery, say—instead of negligence. In fact, the limitations statute, NRS § 41A.097, nods to the practice of including intentional torts within medical malpractice claims. This statute includes limitations for "injury to or the wrongful death of a person . . . from professional services rendered *without consent*." NRS § 41A.097 (emphasis added). The language of "consent" intones the elements of battery. *See Bronneke v. Rutherford*, 89 P.3d 40, 43 (Nev. 2004) ("[B]y performing the neck

1   manipulation without first obtaining Bronneke's consent, Dr. Rutherford committed a battery.").
2   If the Nevada Supreme Court casts a jaundiced eye on the artful pleading of intentional torts, it is
3   likely to view the artful pleading of elder abuse similarly. In the end, it seems, Nevada courts
4   look to "the nature of the grievance to determine the character of the action, not the form of the
5   pleadings." *Egan v. Chambers*, 299 P.3d 364, 366 n. 2 (Nev. 2013) (citing *State Farm Mut. Auto.*
6   *Ins. Co. v. Wharton,* 495 P.2d 359, 361 (1972)).

7   Plaintiffs rely on several California cases in an attempt to avoid this conclusion. In
8   *Covenant Care, Inc. v. Superior Court*, 86 P.3d 290 (Cal. 2004), the California Supreme Court
9   confronted the sad story of Juan Inclan, an "elder," during his eight-week stay at a "skilled
10  nursing facility." While in the care of this facility, Inclan manifested symptoms of "starvation,
11  dehydration, and infection" due to neglect and abuse, and he ultimately died. The plaintiffs sued
12  the nursing facility, seeking to allege claims under California's elder abuse statute, Cal. Welf. &
13  Inst. Code § 15600 *et seq*, as well as claims for punitive damages. *Covenant Care*, 86 P.3d at
14  293. However, California's constellation of medical malpractice statutes, including Cal. Civ.
15  Proc. Code § 425.13, required plaintiffs to ask leave of the court before seeking punitive
16  damages. The California Supreme Court granted review in order to resolve a split among
17  California's Courts of Appeal "as to whether the procedural prerequisites to seeking punitive
18  damages [in medical malpractice actions]. . . apply to punitive damage claims in actions alleging
19  elder abuse." *Covenant Care*, 86 P.3d at 292. The Court held that the punitive damages
20  restriction did not apply to elder abuse claims. *Id.*

21  Plaintiffs urge the same conclusion here (swapping "damages limitation" for "punitive
22  damages"), but *Covenant Care* is distinguishable on the facts. There, the decedent suffered from
23  Parkinson's disease—a chronic debilitating illness—and he resided at a "nursing facility"
24  contracted to provide him long-term care. 86 P.3d at 292. Here, Eugene was admitted to a
25  hospital in order to receive treatment for the temporary ailment of pneumonia (among other
26  afflictions). There, the decedent was attended by "elder custodians." Here, Eugene was attended
27  by "health care providers." *See id.* at 298 ("Without question, health care provider and elder
28  custodian 'capacities' are conceptually distinct."). There, the decedent's injury was not "directly

1  related" to a health care provider's professional services. *Id*. at 299. Here, Eugene's injuries
2  allegedly are so related. In total, *Covenant Care*'s facts fall within the heartland of conduct that
3  the elder abuse statute was intended to regulate. Eugene's facts fall within the heartland of
4  conduct targeted by the medical malpractice statutes. Accordingly, the court is confronted with a
5  choice between applying the elder care statute "to facts only at its outer reaches," *see id*. at 301,
6  and applying the medical malpractice statutes to a clear case of alleged medical malpractice. The
7  court chooses the latter. Therefore, the court dismisses the elder abuse claim as improvidently
8  pleaded.

### 2. Negligence

The court interprets Plaintiffs' negligence claim as one for medical malpractice under Nevada law. NRS § 41A.071 provides that every medical malpractice claim must contain an affidavit "supporting the allegations contained in the action, submitted by a medical expert who practices or has practiced in an area that is substantially similar to the type of practice engaged in at the time of the alleged malpractice." If the claim does not contain this affidavit, the court "shall dismiss the action, without prejudice." *Id.* Defendants challenge the sufficiency of Plaintiffs' expert affidavit.

Plaintiffs' submitted affidavit is sufficient. Defendants do not argue the expert, Dr. Daniel, was not involved in a practice substantially similar to the type of practice here. Rather, Defendants claim the affidavit is defective mainly because it does not explicitly mention each individual defendant by name and specify exactly what each individual did. However, such details are not required in an expert's supporting affidavit.

As Defendants correctly note, the principle behind requiring these affidavits is "to lower costs, reduce frivolous lawsuits, and ensure that medical malpractice actions are filed in good faith based upon competent expert medical opinion." *Washoe Med. Ctr. v. Second Judicial Dist. Court of Nevada*, 148 P.3d 790, 794 (Nev. 2006) (quoting *Szydel v. Markman*, 117 P.3d 200, 204 (Nev. 2005)). However, Daniel's affidavit does not undermine this legislative intent. In his affidavit, Daniel clearly indicates that, in his opinion, Eugene did not receive proper medical treatment while under Mt. Grant's care. He mentions that anyone involved in Eugene's care,

13

1  which would include both Ventura and Williams, were "in breach of their obligations as a
2  doctor." SAC, #39, Exhibit 1, ¶4B. These statements clearly support Plaintiffs' negligence claim,
3  which is all § 41A.071 requires. There is no evidence Plaintiffs' claim is frivolous or made in
4  bad faith.

5  Next, Defendants argue Plaintiffs do not sufficiently state a claim for negligence. In this
6  regard, Defendants rely largely on external medical documents, which the court has already
7  refused to consider at this stage. Defendants also appear to assert that negligence requires
8  complete "failure to provide food, shelter, clothing or services within the scope of the person's
9  responsibility or obligation," rather than mere inadequate care. Defs.' Reply, #53, 12:9–12
10 (quoting NRS § 41.1395(4)(c)). But this is not the correct standard under Nevada's medical
11 malpractice statutes. *See* NRS § 41A.009. For these reasons, Defendants' Motion to Dismiss
12 State Law Claims is denied as it applies to Plaintiffs' negligence claim.

13 **D. Punitive Damages**

14 In their complaint, Plaintiffs seek punitive damages as a separate claim. Plaintiffs and
15 Defendants agree that Plaintiffs cannot claim punitive damages for their state law claims.
16 However, Plaintiffs and Defendants disagree over whether Plaintiffs actually claimed punitive
17 damages for their § 1983 claims. But whether Plaintiffs actually intended their independent claim
18 for punitive damages to apply to their § 1983 claims does not matter, since Plaintiffs adequately
19 repeated the request within each of their § 1983 claims. SAC, #39, ¶¶ 52, 64.

20 Additionally, Defendants argue Plaintiffs cannot seek punitive damages against a public
21 entity or its employees. While punitive damages for § 1983 claims are not available against
22 municipalities, *Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1205 (9th Cir. 1991) (citing *City of*
23 *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981)), the same is not true of the
24 municipality's employees sued in their personal capacities, *see, e.g.*, *Cornwell v. City of*
25 *Riverside*, 896 F.2d 398, 399 (9th Cir. 1990) (awarding punitive damages against public
26 employees). Since Plaintiffs' claims against Ventura and Williams are presumptively claims
27 against them in their personal capacities, *see Romano v. Bible*, 169 F.3d 1182, 1186 (9th Cir.
28 1999), Plaintiffs may seek punitive damages against these defendants for § 1983 violations.

**E. Motion to Substitute and Motion for Leave to Amend**

On February 15, 2013, Eugene died as a result of his health problems. Defendants then served Plaintiffs with a suggestion of death on February 20. After discovering Eugene apparently had no will, on March 26 Troy Brown filed a petition to become Eugene's estate administrator to substitute himself for Eugene in his claims against Defendants. The state court approved Troy as the estate administrator on May 3, 2013. Finally, on June 25, Plaintiffs filed their instant Motion to Substitute.

In the Motion to Substitute, Plaintiffs seek leave to substitute Troy Brown as the "special administrator" of the estate of Eugene Brown in Eugene's place. They also seek, in a "Motion for Leave to Amend" tacked on to the Motion to Substitute, to add a wrongful death claim to the complaint and to add Troy Brown, Eileen Jones, and Holland Dee Mattison as plaintiffs, pursuant to NRS § 41.085. Defendants argue the Motion is untimely as it applies to substituting Troy Brown for Eugene Brown. They further argue the Motion for Leave to Amend lacks a supporting memorandum of points and authorities and lacks a proposed amended complaint, as required by Local Rules 7-2(a) and 15-1, respectively.

If a party to a suit dies while the suit is in progress, any party or the decedent's successor or representative may file a motion to substitute parties (so long as the decedent's legal rights survive). Fed. R. Civ. P. 25(a)(1). But "[i]f the motion is not made within 90 days after service of a statement noting death, the action by or against the decedent must be dismissed." *Id.* If the statement noting death is served upon parties, it must be served according to Rule 5. Fed. R. Civ. P. 25(a)(3). If the statement is served upon nonparty successors, it must be served according to Rule 4. *Id.*

Even though a court generally must dismiss the action if the motion to substitute is not made within 90 days, it may extend the time after the expiration of this period "if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). In determining what constitutes excusable neglect, the court takes into account "all relevant circumstances." *Briones v. Riviera Hotel & Casino*, 116 F.3d 379, 381 (9th Cir. 1997) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). These "relevant circumstances" include "the

1  danger of prejudice to the [opposing party], the length of the delay and its potential impact on
2  judicial proceedings, the reason for the delay, including whether it was within the reasonable
3  control of the movant, and whether the movant acted in good faith." *Id.* In light of these
4  considerations, Plaintiffs' neglect in filing their Motion late is excusable.[4]

5  The danger of prejudice to Defendants is low. In *Cont'l Bank, N.A. v. Meyer*, 10 F.3d
6  1293, 1297 (7th Cir. 1993), for example, the court concluded that the plaintiffs' continued
7  participation through filings and settlement negotiations created "a reasonable belief" that
8  substitution could be effected without prejudice. Even though the plaintiffs filed their motion to
9  substitute eight months after the suggestion of death upon the record, the court found that the
10 plaintiffs' neglect was excusable because there was never any question whether plaintiffs would
11 proceed with the action following the decedent's death. *Meyer*, 10 F.3d at 1297. Here,
12 Defendants themselves filed the suggestion of death; they surely expected Plaintiffs to file the
13 Motion to Substitute. Plaintiffs continued to participate in this action, including by asking
14 Defendants to stipulate to Troy's substitution. And Plaintiffs were only 35 days late in filing the
15 motion. This delay likely had little impact on Defendants or on the judicial proceedings.

16 Further, the delay was predominantly the result of probate proceedings. When Eugene
17 died, Plaintiffs were uncertain who would administer his estate. After searching and discovering
18 there was no apparent administrator, Troy diligently filed his petition to become the
19 administrator. The petition was not granted until May 3, only 18 days before the 90-day deadline.
20 All else remaining equal, but for the 38 days between March 26 and May 3—the time period
21 Plaintiffs waited for Troy to be approved as administrator—Plaintiffs would have timely filed
22 their Motion. Because this delay was largely out of Plaintiffs' control, Plaintiffs' neglect appears
23 excusable.

---

[4] Plaintiffs also argue that the suggestion of death was defective in two ways. First, the suggestion of death did not identify Eugene's successor. Second, the suggestion of death was not properly served on Troy Brown under Rule 4 (despite the fact that Troy is a party to this action). Assuming without deciding that neither the suggestion of death nor its service was defective, the court's decision on Plaintiffs' excusable neglect obviates the need to reach these arguments.

1    The policy behind both Rule 25 and other Federal Rules confirms the result the court
2 reaches. "[T]he history of Rule 25(a) and Rule 6(b) makes it clear that the 90 day time period
3 was not intended to act as a bar to otherwise meritorious actions, and extensions of the period
4 may be liberally granted." *Meyer*, 10 F.3d at 1297 (quoting *Tatterson v. Koppers Co.*, 104 F.R.D.
5 19, 20 (W.D. Pa. 1984)). Furthermore, Rule 17(a)(3) provides that a court "may not dismiss an
6 action for failure to prosecute in the name of the real party in interest until, after an objection, a
7 reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into
8 the action." This rule "is intended to prevent forfeiture when determination of the proper party to
9 sue is difficult or when an understandable mistake has been made." Fed. R. Civ. P. 17 1966
10 advisory committee's note; *see also Goodman v. United States*, 298 F.3d 1048, 1053 (9th Cir.
11 2002). Following this same principle, the court finds Plaintiffs' neglect excusable because they
12 could not determine who the proper party to substitute was until a majority of their allotted time
13 to substitute had already passed.

14    Finally, Plaintiffs appear to have acted in good faith in filing their Motion, and there is no
15 evidence to suggest otherwise. Therefore, the court grants Plaintiffs' Motion to Substitute Troy
16 Brown as representative of Eugene Brown's estate.

17    However, Plaintiffs' "Motion for Leave to Amend" is improperly made. All submitted
18 motions "shall be supported by a memorandum of points and authorities." LR 7-2(a).
19 Additionally, when moving to amend a pleading, "the moving party shall attach the proposed
20 amended pleading." LR 15-1. Plaintiffs have instead requested leave to amend as part of their
21 Motion to Substitute, and they have failed to attach the proposed amended complaint. Because
22 the court has addressed matters in the present order that should affect the content of an amended
23 complaint, because Defendants are owed an opportunity to challenge any Motion for Leave to
24 Amend on its own merits, and because the court will no longer indulge Plaintiffs' numerous
25 procedural missteps, Plaintiffs' Motion for Leave to Amend is denied without prejudice.

26  **IV.    Conclusion**

27    The court grants in part and denies in part Defendants' Motion to Dismiss (#40) as
28 follows: the court grants the Motion as it applies to Mt. Grant. The court denies the Motion as it

Case 3:12-cv-00461-LRH-WGC   Document 72   Filed 08/26/13   Page 18 of 18

applies to Ventura and Williams.

The court grants in part and denies in part Defendants' Motion to Dismiss State Law Claims (#41) as follows: the court grants the Motion as it applies to Plaintiffs' elder abuse claim and denies it as it applies to Plaintiffs' negligence claim. The court grants the Motion as it applies to Plaintiffs' punitive damages claims for state law violations. The court grants the Motion as it applies to Plaintiffs' punitive damages claims against Mt. Grant. The court denies the Motion as it applies to Plaintiffs' punitive damages claims against Ventura and Williams for § 1983 violations.

Finally, the court grants Plaintiffs' Motion to Substitute (#60) Troy Brown as representative of Eugene Brown's estate, in turn denying Defendants' Motion to Dismiss (#57) for failure to substitute. The court denies Plaintiffs' Motion for Leave to Amend (#60) without prejudice.

IT IS THEREFORE ORDERED that Defendants Mt. Grant General Hospital, Juanchichos T. Ventura, M.D., and Daniel A. Williams, Jr., M.D.'s Motion to Dismiss (#40) is GRANTED in part and DENIED in part as described above.

IT IS FURTHER ORDERED that Defendants Mt. Grant General Hospital, Juanchichos T. Ventura, M.D., and Daniel A. Williams, Jr., M.D.'s Motion to Dismiss State Law Claims (#41) is GRANTED in part and DENIED in part as described above.

IT IS FURTHER ORDERED that Plaintiffs Hattie Brown and Troy Brown's Motion to Substitute (#60) is GRANTED. Plaintiffs' Motion for Leave to Amend (#60) is DENIED without prejudice.

IT IS FURTHER ORDERED that Defendants Mt. Grant General Hospital, Juanchichos T. Ventura, M.D., and Daniel A. Williams, Jr., M.D.'s Motion to Dismiss (#57) is DENIED.

IT IS SO ORDERED.

DATED this 23rd day of August, 2013.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE