UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| HATTIE BROWN, EILEEN JONES, HOLLAND DEE MATTISON, and TROY BROWN, individually and as the Special Administrator of the ESTATE OF EUGENE BROWN, deceased,<br><br>　　　　　　　Plaintiffs,<br><br>  v.<br><br>MT. GRANT GENERAL HOSPITAL; JUANCHICHOS T. VENTURA, M.D., DOES 1-25, DOE CORPORATIONS 1-20, and STATE DOES 1-20, inclusive,<br><br>　　　　　　　Defendants. | 3:12-cv-0461-LRH-WGC<br><br><br>ORDER |

Before the Court is Defendants Mt. Grant General Hospital and Juanchichos T. Ventura's (collectively, "Defendants") Motion for Summary Judgment. Doc. #101.[1] Plaintiffs Hattie Brown, Eileen Jones, Holland Dee Mattison, and Troy Brown (collectively, "Plaintiffs") filed an Opposition (Doc. #108), to which Defendants replied (Doc. #119). Also before the Court is Plaintiffs' Motion to Amend Complaint to Conform to Evidence. Doc. #104. Defendants filed an Opposition (Doc. #110), to which Plaintiffs replied (Doc. #113).

///

///

---

[1] Refers to the Court's docket number.

**I.      Facts and Procedural Background**

This action stems from the alleged mistreatment of Eugene Brown ("Brown"), an elderly black man, while he was in the care of Mt. Grant General Hospital ("Mt. Grant") and physician Juanchichos T. Ventura ("Dr. Ventura").  Brown was admitted to Mt. Grant for treatment of his bronchitis on March 9, 2011.  At the time, Brown was an incapacitated adult under the guardianship of his wife Hattie and his son Troy.[2]  Brown was hospitalized at Mt. Grant through May 19, 2011.

During Brown's hospitalization, while heavily medicated and under the care of Dr. Ventura and other Mt. Grant nurses and doctors, Eugene developed decubitus ulcers—also known as bedsores—which Plaintiffs argue that Defendants intentionally concealed.  Brown was placed on a turn schedule, one method for preventing the development of decubitus ulcers, on March 28, 2011.  Records indicate that Mt. Grant staff first noticed three ulcers on Brown's buttocks on March 30, although Dr. Ventura was not informed of such ulcers until April 5.  By April 6, Brown had five ulcers, which had progressed to "stage II wounds."  By April 8, the wounds had spread to his tail bone area and scrotum.  By April 13, the wounds had spread to Brown's testes and penis, and nurses wrote that they were having difficulty keeping the areas clean from fecal matter.

Brown's condition worsened on or about April 10, as he was diagnosed with congestive heart failure and the re-occurrence of a colocutaneous fistula that pre-dated his hospitalization at Mt. Grant.  Dr. Ventura discussed these ailments with Brown and surgeon Dr. Murray, and both determined that surgery was not necessary at that time.  Thereafter, Brown showed signs of improvement and was transferred to the skilled nursing unit on April 18.

Dr. Ventura left the country on April 22, 2011, and Dr. Jeffrey Stein ("Dr. Stein") thereafter assumed Brown's care.  Brown's condition continued to worsen.  Brown frequently complained of "wound pain," and on April 26, a nurse noted that Brown had lost more than thirty pounds in twelve days.  On May 9, Nurse Kendall Harris consulted with wound care specialist Erin Harms

---

[2] Brown died on February 15, 2013.

2

("Harms") to inquire about the use of a wound vac system, a suction device that promotes healing by removing secretions that cause infections. Harms stated that a wound vac could not be applied until the wound had been debrided, and suggested that Brown be referred for surgical debridement. On May 19, Nurse Susan Nikrik spoke to Dr. Stein about Brown's wounds, and Dr. Stein thereafter recommended that Brown be transferred for surgical debridement. Brown was transferred to Banner Churchill Community Hospital in Fallon, Nevada, on May 20, 2011.

Defendants removed this action from Nevada state court on August 28, 2012. Doc. #1. The operative Complaint for purposes of this Motion, Plaintiffs' Fourth Amended Complaint, was filed on October 23, 2013, and alleges three causes of action: (1) negligence and wrongful death; (2) violation of Brown's civil rights under 42 U.S.C. § 1983; and (3) state-created danger under § 1983. Doc. #84. Defendants filed their Motion for Summary Judgment on May 21, 2015. Doc. #101. On June 22, 2015, Plaintiffs filed a Motion to Amend their Complaint (Doc. #104) to revive the elder abuse claim that had been dismissed by the Court's Order entered on August 26, 2013 (Doc. #72).

**II.    Motion to Amend**

Plaintiffs request leave to amend to revive their elder abuse claim that the Court dismissed in its Order entered on August 26, 2013. Plaintiffs argue that amendment is appropriate because the Court based its dismissal of this claim partially on the fact that "both the plain language of [NRS] 41.1395 and its legislative history suggest that the statute targets the relationship between long-term caretakers and their charges." Doc. #72 at 10. Plaintiffs point to documents obtained in discovery which refer to the Mt. Grant website's "Services Provided" page, which includes "Skilled Nursing Facility (SNF) and Long Term Care (LTC)." Plaintiffs argue that this indicates that Defendants can be held liable under Nevada's elder abuse law after all. Doc. #104 at 2. Defendants argue that it is improper for Plaintiffs to move for such an amendment nearly two years after the elder abuse claim was dismissed, noting that the deadline for amended pleadings was September 24, 2013. Doc. #110 at 7. Defendants add that amendment would be futile because a

3

central aspect of the Court's dismissal of this claim was that "the elder abuse statute was not intended as a remedy for torts that sound in medical malpractice such as those alleged here." Doc. #72 at 9.

Federal Rule of Civil Procedure 15(a)(2) provides that courts should "freely grant leave [to amend] when justice so requires." The standard for granting leave to amend is generous, and courts will generally only decline to grant leave to amend if the party opposing amendment shows "bad faith, undue delay, prejudice to the opposing party, futility of amendment," or that the plaintiff has previously amended the complaint without healing its defects. *United States v. Corinthian Colls.*, 655 F.3d 984, 995 (9th Cir. 2011) (citing *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004)).

The Court agrees with Defendants that granting leave to file a fifth amended complaint to revive Plaintiffs' elder abuse claim would be futile. The Court previously dismissed this claim for three separate reasons. First, "the elder abuse statute was not intended as a remedy for torts that sound in medical malpractice." Doc. #72 at 9. The Court emphasized that the elder abuse statute "was initially concerned with criminal conduct—conduct whose mens rea element usually exceeds mere negligence." *Id.* at 10. Second, the Court found that the elder abuse "statute's text and legislative history primarily address the regulation of long-term care for the elderly." *Id.* The Court noted that hospitals were not included in the list of facilities deemed long-term care facilities by the Nevada legislature. *Id.* at 11. Third, the Court noted that "the Nevada Supreme Court has signaled a disapproval of artful pleading for the purposes of evading the medical malpractice limitations." *Id.* (citing *Fierle v. Perez*, 219 P.3d 906, 913 n.8 (Nev. 2009), *overruled on other grounds by Egan v. Chambers*, 299 P.3d 364 (Nev. 2013)). The Court added that "a plaintiff cannot escape the malpractice statutes' damages or timeliness limitations by pleading an intentional tort . . . instead of negligence." *Id.* The Court sees no reason why this analysis would not bar Plaintiffs from using artful pleading to revive their elder abuse claim when the underlying alleged damages clearly sound in medical malpractice.

///

Two of the Court's three separate reasons for dismissing Plaintiffs' elder abuse claims had nothing to do with whether Mt. Grant is considered a "long-term care" facility. Accordingly, any amendment to revive Plaintiffs' elder abuse claim based on Plaintiffs' contention that Mt. Grant is a long-term care facility would be futile.[3] Accordingly, the Court denies Plaintiffs' Motion to Amend their Complaint (Doc. #104). *See Corinthian Colls.*, 655 F.3d at 995 (finding that amendment would be futile if it is clear that the claim "could not be saved by any amendment").[4]

### III.    Motion for Summary Judgment

#### A.  Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001). A motion for summary judgment can be complete or partial, and must identify "each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a).

///

---

[3] Defendants argue that Plaintiffs' Motion to Amend should be analyzed under Federal Rule of Civil Procedure 16(b), which concerns the time to file an amended pleading based on the Scheduling Order, and requires good cause and the court's consent. Fed. R. Civ. P. 16(b)(3)-(4). Because the Court finds that amendment is improper under Rule 15, the Court does not consider Defendants' Rule 16 arguments.

[4] Defendants filed a Motion to Strike Plaintiffs' Reply to Defendants' Response to the Motion to Amend (Doc. #113), alleging that it raised arguments not raised in the original Motion. *See Avery v. Marsky*, No. 3:12-cv-0652, 2013 WL 1663612, at *2 (D. Nev. Apr. 17, 2013) ("[I]t is improper for a party to raise a new argument in a reply brief."). The Court denies Defendants' Motion to Strike (Doc. #114) as moot because the Court did not rely on the challenged arguments in Plaintiffs' Reply in its consideration of Plaintiffs' Motion to Amend.

5

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On an issue as to which the nonmoving party has the burden of proof, however, the moving party can prevail merely by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case. *Celotex*, 477 U.S. at 323.

To successfully rebut a motion for summary judgment, the nonmoving party must point to facts supported by the record that demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Liberty Lobby*, 477 U.S. at 248. Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the party. *See id.* at 252. "[S]peculative and conclusory arguments do not constitute the significantly probative evidence required to create a genuine issue of material fact." *Nolan v. Cleland*, 686 F.2d 806, 812 (9th Cir. 1982).

**B. Discussion**

Defendants move for summary judgment on all three remaining claims: (1) negligence and wrongful death; (2) abridgement of civil rights under 42 U.S.C. § 1983; and (3) state created danger under § 1983. All three of these claims are based on Plaintiffs' allegations that Mt. Grant personnel and Dr. Ventura did not take adequate precautions to prevent the development of bedsores that eventually caused Brown's death. The Court considers each claim in turn.

### 1. Negligence and Wrongful Death

Defendants' primary argument is that Plaintiffs cannot establish actual and proximate cause—essential elements of a negligence claim—to a reasonable degree of medical certainty. Plaintiffs argue that the testimony of their expert Dr. Loren Lipson ("Dr. Lipson") reveals a genuine dispute of material fact regarding whether Dr. Ventura and Mt. Grant's negligence was a contributing factor to the ailments that eventually caused Brown's death.

The elements of a negligence claim under Nevada law are that: (1) defendant owed plaintiff a duty of care; (2) defendant breached that duty of care; (3) the breach was the actual cause of plaintiff's injury; (4) the breach was the proximate cause of plaintiff's injury; and (5) plaintiff suffered damages. *Perez v. Las Vegas Med. Ctr.*, 805 P.2d 589, 590-91 (Nev. 1991); *Kusmirek v. MGM Grand Hotel, Inc.*, 73 F. Supp. 2d 1222, 1224 (D. Nev. 1999). Under Nevada law, a plaintiff alleging negligence based on medical malpractice must establish that: (1) defendant's conduct departed from the accepted standard of care or practice; (2) defendant's conduct was the actual and proximate cause of the injury; and (3) the plaintiff suffered damages. *Derosa v. Blood Sys., Inc.*, 298 F.R.D. 661, 663-64 (D. Nev. 2014) (citing *Prabhu v. Levine*, 930 P.2d 103, 107 (1996)).

Nevada's medical malpractice statutes define "professional negligence" as "the failure of a provider of health care, in rendering services, to use the reasonable care, skill or knowledge ordinarily used under similar circumstances by similarly trained and experienced providers of health care." NRS 41A.015. Evidence of professional negligence can arise from:

> evidence consisting of expert medical testimony, material from recognized medical texts or treatises or the regulations of the licensed medical facility wherein the alleged negligence occurred is presented to demonstrate the alleged deviation from the accepted standard of care in the specific circumstances of the case and to prove causation of the alleged personal injury or death.

NRS 41A.100. To establish wrongful death in a medical malpractice case, plaintiff must show a "reasonable medical probability" that the doctor's conduct caused plaintiff's death. *Fernandez v. Admirand*, 843 P.2d 354, 361 (Nev. 1992).

///

Plaintiffs' expert Dr. Lipson testified to "a reasonable degree of medical probability" that Brown's osteomyelitis and pressure ulcers were "contributing factors" to his death. Doc. #109, Ex. 4 at 138:3-5. Dr. Lipson continued:

> I can say that in a – in my opinion, had this – had he not had these, he wouldn't have had the sequelae of events that happened subsequently, some of which I do not know. But the proximal cause of his death is what happened to him at the Mount Grant facility, in my opinion, in all reasonable medical probability. I can't say the only cause of his death was from the osteomyelitis, but I can say that had he not had all the experiences that did occur at the facility, he would not have died, in my opinion, when – when he did.

*Id.* at 138:6-17.[5] Plaintiffs add that Defendants' own expert, Dr. Jeffrey Gaplin ("Dr. Gaplin") testified that the ulcers developed at Mt. Grant played a role in Brown's death. Indeed, Dr. Gaplin testified that the ulcers played a "small role" (Doc. #109, Ex. 3 at 95:16-20), and an "important role" (*Id.* at 42:2-3), but that the ulcers developed at Mt. Grant were "not nearly the top one, two, three, four, five or sixth role compared to the problems that [Brown] entered with and the problems that he remained with until he died" (*Id.* at 42:3-6).[6]

Defendants argue that the Court should disregard Dr. Lipson's testimony because his report "contained only a conclusory assertion that the care rendered at Mt. Grant caused Mr. Brown's injuries. Aside from its conclusory nature, it lacks any factual foundation." Doc. #101 at 25. Defendants add that Dr. Lipson's opinions were based largely on review of the Mt. Grant medical

---

[5] Defendants argue that the Court should not consider the causation testimony in Dr. Lipson's deposition because his initial report "lacked a causation opinion" and a party cannot "circumvent[] the requirement for a timely and complete expert witness report." Doc. #119 at 23 (quoting *Allstate Ins. Co. v. Balle*, No. 2:10-cv-2205, 2013 WL 5797848, at *2 (D. Nev. Oct. 28, 2013)). However, Dr. Lipson's written report states: "Had [Brown] received the appropriate monitoring and care to which he was entitled, he would not have died when he did, but would have lived longer, in all reasonable medical certainty." Doc. #109, Ex. 16 at 4; *see also id.* at 5 (noting that Mt. Grant and Dr. Ventura's treatment "contributed to [Brown's] physical and mental decline, and significantly contributed to his morbidity and later to his death"); *id.* at 6 ("Many of these damages lasted the rest of his life and played a role in his death."); *id.* at 11 ("When [Brown] died, he still was suffering from his major pressure ulcer which, [in] all reasonable medical probability, played a significant role in his death.").

[6] Dr. Gaplin testified that he could not predict whether Brown would have died on the same day whether or not he had the ulcers. Doc. #109, Ex. 3 at 43:10-17. Dr. Gaplin added: "If he'd never had a decubitus ulcer, he might have gained a week. He could have gained a month. He probably would have gone a few days, a month, maybe better, because it contributed. It's an apportionment." *Id.* at 43:18-21.

records, not medical records that followed Brown's discharge. *Id.* Defendants argue that without a review of the records in the years immediately preceding Brown's death, "Dr. Lipson simply cannot conclude to a reasonable degree of medical probability that the treatment rendered at Mt. Grant was the cause of Mr. Brown's death." *Id.* The Court finds nothing in the language of NRS 41A.100 to indicate that Dr. Lipson's expert testimony is improper and should be disregarded. Dr. Lipson's expert report reveals that he is an experienced physician who is qualified to testify as an expert. *See* Doc. #109, Ex. 16 at 1-3. Additionally, Dr. Lipson testified under oath that to a reasonable degree of medical certainty, the ulcers that developed at Mt. Grant contributed to Brown's death. Accordingly, the Court considers Dr. Lipson's testimony along with other evidence and testimony both parties presented to the Court.

Defendants also argue that Plaintiffs mischaracterized Dr. Gaplin's testimony, claiming that Dr. Gaplin's testimony regarding ulcers primarily referred to ulcers on Brown's elbow, calf, and knee. Doc. #119 at 25. However, this refers to a portion of Dr. Gaplin's testimony where Plaintiffs' attorney asked if the ulcers he referred to "includ[ed] elbow, left calf, left knee." Doc. #109, Ex. 3 at 42:13-24. Nothing in Dr. Gaplin's testimony limited his testimony to ulcers on the elbow, calf, and knee. Furthermore, Defendants note that Dr. Gaplin testified that "[m]ost people don't die of osteomyelitis due to a decubitus ulcer." Doc. #119 at 25 (quoting Doc. #109 at 42:25-43:1). However, this does not resolve the disputed questions regarding whether the ulcers that developed at Mt. Grant were contributing factors to Brown's subsequent death.

The Court finds that there remain disputed questions of material fact regarding whether the wounds that developed while Brown was in the care of Dr. Ventura and Mt. Grant were a cause of his subsequent death. Dr. Lipson testified to a reasonable degree of medical certainty that these injuries contributed to Brown's death, and Dr. Gaplin testified that these wounds played at least a "small role." In light of this testimony, Defendants have not established that no reasonable juror could find that the wounds Brown developed at Mt. Grant were a cause of his death. It is for the jury to determine the credibility of these expert witnesses, and the extent to which Mt. Grant and

9

Dr. Ventura contributed to Brown's death. Accordingly, the Court denies Defendants' Motion for Summary Judgment as to Plaintiffs' negligence/wrongful death claim.

### 2. Civil Rights Claims

To prevail on a civil rights action under 42 U.S.C. § 1983, plaintiff must establish "(1) a violation of rights protected by the Constitution or created by federal statute, (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The Ninth Circuit Court of Appeals has long held that the state's failure to protect a citizen's liberty interest in her body does not violate the Fourteenth Amendment. *Campbell v. State of Wash. Dep't of Soc. and Health Servs.*, 671 F.3d 837, 842 (9th Cir. 2011). This principle holds unless one of two exceptions applies: (1) the special relationship exception, or (2) the state-created danger exception. *Id.* A "special relationship" is created when "the State takes a person into its custody and holds him there *against his will*." *Id.* (emphasis in original). "The state-created danger exception creates the potential for § 1983 liability where a state actor 'creates or exposes an individual to a danger which he or she would not have otherwise faced.'" *Id.* at 845.

The "person" acting under color of state law for the purposes of Plaintiffs' civil rights claims is Dr. Ventura, a public official due to his role at a public hospital. Plaintiffs' state-created danger claim must therefore pertain to Dr. Ventura's conduct prior to leaving the country on April 22, 2011. The Court considers each of Plaintiffs' civil rights claims in turn.

#### a. Special Relationship

Defendants frame Plaintiffs' second claim for relief as a civil rights claim based on the special relationship between Dr. Ventura and Brown, and argue that no such special relationship can exist because Brown voluntarily resided at Mt. Grant. The Court agrees that Plaintiffs' second claim is best analyzed under the special relationship exception to the rule that the state cannot be liable for a failure to protect a citizen's liberty interest in her body. *See* Fourth Amended Complaint, Doc. #84 at 9 ¶42 (alleging that Defendants purposefully acted to deprive Brown "of his rights to bodily integrity, privacy, and freedom from unjustified intrusions of his personal

10

security"). Plaintiffs' Opposition focuses primarily on Defendants' challenge to their state-created danger claim, and does not directly address whether a special relationship existed between Dr. Ventura and Brown.

The Supreme Court has held that a "special relationship" exists between the state and an individual only when the individual is held against her will. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989). "Mere custody, however, will not support a 'special relationship' claim where a 'person *voluntarily resides* in a state facility under its custodial rules.'" *Campbell*, 671 F.3d at 843 (quoting *Walton v. Alexander*, 44 F.3d 1297, 1305 (5th Cir. 1995)).

There is no evidence that Brown was committed to Mt. Grant against his will. In fact, Brown's son Troy Brown testified that Brown voluntarily entered Mt. Grant and never requested to leave, nor did any members of his family. Doc. #101, Ex. 3 at 46:1-23. Accordingly, Plaintiffs cannot establish that a special relationship existed between Dr. Ventura and Brown to support their second claim for relief, for a civil rights violation based on the special relationship between Dr. Ventura and Brown. Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiffs' second claim, for a civil rights violation under 42 U.S.C. § 1983 under the special relationship exception.

      **b.**  **Age and Race Discrimination**

Plaintiffs appear to argue that their second claim for relief should also be interpreted as a claim for violations of his civil rights based on age and race discrimination. Plaintiffs' Fourth Amended Complaint states that Defendants purposefully acted to deprive Brown of "those rights provided by the United States Constitution federal law to be free from racial and age discrimination." Doc. #84 at 9 ¶42. This claim is based on the allegation that Brown was told that he could not be transported to another facility based on expense, but during this same time period, Mt. Grant transported a younger Caucasian woman. Defendants argue that to the extent Plaintiffs' second claim for relief is interpreted as an age and race discrimination claim, Plaintiffs have not identified any evidence to support their allegations.

11

Plaintiffs' age and race discrimination claim is based on the declaration of Ruth Montgomery ("Montgomery"), State of Nevada investigator, who stated that "[n]o one at Mt. Grant provided an explanation as to why [Brown], an elderly black man, could not be transported to another facility for emergency lifesaving surgery while a non-emergency younger white female patient was transported to another facility." Doc. #109, Ex. 41 at 3 ¶17. Montgomery's declaration was dated November 16, 2012. In a subsequent deposition, dated January 21, 2015, Montgomery stated that the Caucasian woman who she initially believed was transferred before Brown was actually transferred in January of 2012, more than six months *after* Brown's transfer. Doc. #101, Ex. 12 at 171:1-18. Montgomery added that she was not aware of any other patient who was transferred before Brown during his time at Mt. Grant. *Id.* at 171:19-22, 172:20-173:2.

To the extent that Plaintiffs' second claim for relief is interpreted as an age and race discrimination claim, the Court finds that Plaintiffs have failed to identify any evidence to support the claim. Plaintiffs' Opposition relies solely on Montgomery's November 16, 2012, declaration that a younger white woman was transferred before Brown. *See* Doc. #108 at 31-33. However, this evidence was directly contradicted by Montgomery's January 21, 2015, deposition, stating that the younger white woman was actually transferred after Brown. Plaintiffs have not identified evidence to rebut this testimony. Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Brown's claim for age and race discrimination.

### c.    State-Created Danger

Plaintiff's third claim for relief is a § 1983 claim based upon the state-created danger exception. Defendants argue that there is no evidence that Dr. Ventura acted with deliberate indifference to put Brown in a state-created danger. Defendants argue further that the injuries Brown sustained at Mt. Grant "were caused by dangers inherent in his own pre-existing physical conditions and limitations." Doc. #101 at 20. Plaintiffs argue that disputed questions of material fact remain regarding whether Dr. Ventura's conduct substantially contributed to the creation of a danger.

"The state-created danger exception creates the potential for § 1983 liability where a state actor 'creates or exposes an individual to a danger which he or she would not have otherwise faced.'" *Campbell*, 671 F.3d at 845. "To prevail under the danger creation exception, a plaintiff must first show that 'the state action affirmatively place[s] the plaintiff in a position of danger, that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced.'" *Johnson v. City of Seattle*, 474 F.3d 634, 639 (9th Cir. 2007) (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006)). Plaintiffs must also "demonstrate that the danger to which the individual was exposed 'was known or obvious' and that the state 'acted with deliberate indifference to it.'" *Campbell*, 671 F.3d at 845 n.8 (citing *Kennedy*, 439 F.3d at 1064). "Deliberate indifference is 'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011) (quoting *Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). For deliberate indifference to apply, the state actor must recognize an unreasonable risk and "actually intend[] to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Id.* (quoting *L.W. v. Grubbs*, 92 F.3d 894, 899 (9th Cir. 1996)). "The deliberate-indifference inquiry should go to the jury if any rational factfinder could find" that defendant acted knowing that something *was* going to happen but ignored the risk and exposed plaintiff to that harm. *Id.* (citing *Wood v. Ostrander*, 879 F.2d 583, 588 n.4 (9th Cir. 1989)).

Plaintiffs refer to the testimony of Dr. Lipson, who opined that Dr. Ventura's conduct directly caused Brown to develop anasarca, a condition which causes an individual to retain extreme amounts of liquid, and that this condition contributed to the development of Brown's ulcers. Specifically, Dr. Lipson testified that the anasarca was preventable:

> Had, instead of fluids being run in by Dr. Ventura, he actually looked at what the intake and output was, which showed . . . like on the 10th of March, he took in 3820 [cc's of water] and put out 1325. On the 11th, 4280 and put out 1400. On the 12th, he took in 4283, urinated 1280. On the 13th, took in 4660, urinated 1600 . . . . On the 14th, he took in 2700 cc's more than he put out. On the 15th, about 2800 cc's more than he put out.

13

Doc. #109, Ex. 4 at 48:12-23.  Dr. Lipson then opined that Brown developed anasarca as a result of taking in too much water over this period: "[T]hat's why he got anasarca.  It was iatrogenic or physician caused." *Id.* at 49:1-6.  Dr. Lipson opined that the excessive water given to Brown, in addition to inadequate procedures for moving Brown to ensure that sores did not develop, created at least a dispute of material fact to support Plaintiffs' state-created danger claim.  Based on Dr. Lipson's testimony, Plaintiffs have created a genuine dispute regarding whether Dr. Ventura's treatment instigated conditions that led to Brown's ulcers.

Defendants argue that Dr. Ventura cannot be found deliberately indifferent because contrary to Plaintiffs' assertions, Dr. Ventura took steps to treat a variety of Brown's ailments.  Specifically, Defendants note that "Dr. Ventura took precautions, like making sure Mr. Brown was turned properly, was kept very clean and dry in the pressure areas like the buttocks, the gluteal area, heels and even the upper trunk, and addressed nutrition and hydration, all while taking care of [Brown's] multiple acute medical problems." Doc. #119 at 16.  Dr. Gaplin described Brown's litany of ailments Dr. Ventura was forced to deal with simultaneously:

> [T]his doctor was also fighting pneumonia, fighting heart failure, fighting anasarca, fighting half a dozen other things, his malnutrition, his elevated white count, his low albumin . . . .  Practically, on a prioritized point of view, he was fighting to keep him alive in terms of breathing, his heart, and what was happening to him with infection elsewhere.

Doc. #101, Ex. 23 at 73:13-24.  Additionally, Grant was originally diagnosed with dehydration and "failure to thrive," which Defendants claim indicates that Dr. Ventura was not deliberately indifferent to his condition when he ordered Brown to be hydrated, even if this led to the development of anasarca.  *Id.*, Ex. 6 at 2; *see Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) ("[W]here a defendant has based his actions on a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances, plaintiff has failed to show deliberate indifference, as a matter of law.").

Even if Dr. Ventura's treatment led to Brown's anasarca, Plaintiffs have not identified any evidence indicating that Dr. Ventura was deliberately indifferent to Brown's condition—i.e., that he

14

"actually intend[ed] to expose the plaintiff to such risks without regard to the consequences." *Patel*, 648 F.3d 974. Plaintiffs identify a number of actions that they allege indicates that Dr. Ventura acted deliberately indifferent: overloading Brown with liquids, thereby contributing to the development of anasarca; over-medicating Brown so that he could not reposition himself; failing to ensure his medical staff moved Brown frequently; and concealing that the sores were worsening in his treatment notes and conversations with Brown's family. The majority of these actions appear to have occurred during Dr. Ventura's good faith attempt to treat Brown's ailments, and Plaintiffs have not identified any evidence to indicate that his treatment decisions were made with intent to expose Brown to unreasonable risks without regard to the consequences.[7] The Court notes that mistaken treatment decisions, absent intent to cause unreasonable risk, are better analyzed under Plaintiffs' negligence claim than a state-created danger § 1983 claim. *Id.* at 976 ("[M]ere negligence—or even gross negligence—is not enough for deliberate indifference.").

*Patel*'s discussion of the case law on deliberate indifference is instructive. In *Grubbs*, the Ninth Circuit Court of Appeals held that deliberate indifference § 1983 cases require a culpable mental state, which is a standard higher than gross negligence. 92 F.3d at 898-900. *Patel* noted that a number of post-*Grubbs* cases nonetheless allowed deliberate indifference theories to proceed to trial. In *Penilla v. City of Huntington Park*, the Ninth Circuit found disputed facts regarding deliberate indifference where two police officers responded to a medical call, canceled the request for paramedics, moved Penilla from his porch inside his home, and left. 115 F.3d 707, 708 (9th Cir. 1997). Penilla died the following day of respiratory failure. *Id.* The court allowed the case to proceed to trial because disputed questions remained because the officers disregarded Penilla's

---

[7] The Court previously denied Defendants' Motion to Dismiss based largely on the fact that Dr. Ventura and another Defendant who was subsequently dismissed ignored the advice of a "wound care consultant" who allegedly suggested surgery on April 9, 2011. Doc. #72 at 5. It appears that Plaintiffs incorrectly stated that this consultation occurred on April 9, whereas the evidence demonstrates that it occurred on May 9. *See* Doc. #101, Ex. 6 at MG 369. This consultation therefore occurred after Dr. Ventura left the country (on April 22), and cannot support Plaintiffs' state-created danger claim because Dr. Ventura cannot be said to be deliberately indifferent for conduct that occurred after he left the country, and § 1983 claims must be based on actions of individual defendants. *See Crumpton*, 947 F.2d at 1420 (claims under § 1983 require conduct by a "person" acting under color of state law).

immediate and serious medical need by placing him inside and cancelling Penilla's request for paramedics. *Id.* at 710-11.

In *Kennedy v. City of Ridgefield*, the Ninth Circuit found disputed facts in a case involving an officer who responded to reports that a nine year old girl had been abused by a mentally unstable neighbor. 439 F.3d at 1057. After learning that the family feared a violent retaliatory response, the officer promised that he would warn them before he informed the neighbors about the allegations. *Id.* at 1058. After the officer spoke to the neighbors without warning the Kennedy family, he promised additional patrols to protect the family from possible retaliation. *Id.* The patrols were not provided, however, and the neighbor broke into the Kennedy family's home and shot both parents. *Id.* The court found that the officer's awareness of the potential harm caused by the neighbor and refusal to provide protections despite promises to do so created a genuine dispute regarding deliberate indifference.

Plaintiffs' deliberate indifference allegations do not match the culpable state of mind described in *Penilla* and *Kennedy*, which both involve affirmative acts that placed the plaintiff in danger without regard to a clear imminent risk. Plaintiffs' strongest argument is that disputed questions of material fact remain regarding whether Dr. Ventura actively concealed the fact that Brown's sores were worsening, in both his treatment notes and conversations with Brown's family. If Plaintiffs were to identify evidence of such a practice, this could constitute deliberate indifference to support a state-created danger claim under § 1983. However, Plaintiffs' only evidence that Dr. Ventura concealed the worsening condition of Brown's sores in his notes is the allegation that "Dr. Ventura made a conscious and deliberate decision to simply paste the same entry regarding [Brown's] sores into the notes over and over again, despite the fact that the sores were getting worse." Doc. #108 at 28-29. Plaintiffs' only evidence that Dr. Ventura actively concealed the sores from Brown's family is the "absence of any citation by defendants to any records reflecting that the sores were discussed in any manner with [Brown] or any of his family." *Id.* at 30. These conclusory allegations do not meet Plaintiffs' burden of identifying facts in the

record that demonstrate a genuine issue of material fact regarding Dr. Ventura's culpable state of mind. *Reese*, 208 F.3d at 738.

Plaintiffs have failed to identify any evidence to indicate that Dr. Ventura was deliberately indifferent to Brown's condition, a required element of a § 1983 state-created danger claim. Once the moving party establishes the absence of disputed questions of material fact, the non-moving party must point to facts supported by the record to identify such disputed questions to preclude summary judgment. *Id.* Plaintiffs have not identified such evidence with regard to deliberate indifference. A doctor's choice of treatment does not constitute deliberate indifference—even if it is wrong—absent evidence showing unnecessary risk without regard for the patient's health. *See Patel*, 648 F.3d at 976 ("[M]ere negligence—or even gross negligence—is not enough for deliberate indifference."); *Jackson*, 90 F.3d at 332 ("[W]here a defendant has based his actions on a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances, plaintiff has failed to show deliberate indifference, as a matter of law.") Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiffs' § 1983 claim based on a state-created danger.

## IV.   Conclusion

IT IS THEREFORE ORDERED that Plaintiffs' Motion to Amend Complaint (Doc. #104) is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion to Strike Plaintiffs' Reply (Doc. #114) is DENIED.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment (Doc. #101) is GRANTED in part and DENIED in part. The parties shall file a joint pretrial report with the Court within forty-five (45) days of this Order.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Leave to File Excess Pages (Doc. #107) is GRANTED.

///

IT IS FURTHER ORDERED that Defendants' Motion for Leave to File Excess Pages (Doc. #118) is GRANTED.

IT IS SO ORDERED.

DATED this 9th day of September, 2015.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE